UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| GAYLE GWOZDZ<br>  Plaintiff, | : | |
| | : | |
| v. | : | CIVIL NO: 3:13-CV-00317-JAM |
| | : | |
| GENESIS ELDERCARE PHYSICIAN<br>SERVICES INC. d/b/a GENESIS PHYSICIAN<br>SERVICES | : | |
| | : | JULY 30, 2014 |
|   Defendant. | : | |

## **DEFENDANT'S MEMORANDUM OF LAW IN SUPPORT OF ITS MOTION FOR SUMMARY JUDGMENT**

DEFENDANT,
GENESIS ELDERCARE PHYSICIAN
SERVICES, INC. D/B/A GENESIS
PHYSICIAN SERVICES

By:   /s/ Holly L. Cini
Holly L. Cini (ct 16388)
cinih@jacksonlewis.com
Sarah R. Skubas (ct 28327)
sarah.skubas@jacksonlewis.com
Jackson Lewis P.C.
90 State House Square, 8th Floor
Hartford, CT  06103
T: (860) 522-0404
F: (860) 247-1330

# TABLE OF CONTENTS

TABLE OF AUTHORITIES .................................................................................. iv, v

I.    INTRODUCTION ..................................................................................................1

II.   SUMMARY ...........................................................................................................1

III.  FACTUAL BACKGROUND...................................................................................3

    A.    GPS Is An Equal Opportunity Employer & Fosters An Open Door Policy Of
        Communication ...........................................................................................3

    B.    Genesis Physician Services' Relationship With Genesis Healthcare ....................3

    C.    Plaintiff's 66-Day, At-Will, Probationary Employment Tenure ...........................4

        1.    The Decision To Hire An APRN At KHS .................................................4

        2.    Plaintiff's APRN Role At Award-Winning Kimberly Hall South..............5

        3.    GPS Provided Extensive Orientation And Training To Plaintiff................5

        4.    Plaintiff's First Weeks On The Job And Additional Training ....................7

        5.    Plaintiff's Ongoing Correspondence With Ms. Nadeau ...........................9

        6.    GPS' Further Attempts To Support Plaintiff By Having The
               Center Thoroughly Review Any Nursing Concerns She Identified ..........11

        7.    A Nurse Complains That Plaintiff Is Sleeping On The Job......................12

        8.    Meetings with KHS Management To Help Plaintiff Integrate And
               Perform More Effectively ........................................................................13

        9.    Plaintiff's Communication With Human Resources................................14

        10.    Delivery Of The PIP And Plaintiff's Response That She Had
               Thrown Her Dog Down Cement Stairs .....................................................15

        11.    Plaintiff's Refusal To Discuss The PIP ...................................................16

        12.    The Termination Of Plaintiff's Employment............................................17

        13.    The Complaints Plaintiff Filed With Public Agencies About Which
               No One at GPS Was Aware Until After Her Termination.........................17

IV.   PROCEDURAL POSTURE ..................................................................................18

V.    ANALYSIS...........................................................................................................18

    A.    Summary Judgment Standard........................................................................18

    B.    The Applicable Legal Analysis Dictates That Genesis Is Entitled To
        Summary Dismissal As A Matter Of Law On Plaintiff's Claim Of
        Gender Discrimination Under Both Federal And State Law....................................19

    C.    GPS Is Entitled To Summary Judgment On Counts One And Two Because
        Plaintiff Fails To Demonstrate A *Prima Facie* Case Of Gender Discrimination.......21

        1.    Plaintiff's Managers And The Termination Decision-makers Were In
               The Same Protected Class As Plaintiff And Had Made The Decision
               To Hire Her Just Four Months Prior .......................................................21

        2.    The Sole Remark Alleged By Plaintiff In Support Of Her
               Gender Discrimination Claim Does Not Give Rise To An Inference
               Of Discrimination ..................................................................................22

        3.      Genesis Had A Legitimate, Non-Discriminatory Business Reason For Terminating Plaintiff's Employment.....................................................24

        4.      Plaintiff Fails To Show That Genesis' Legitimate, Non-Discriminatory Reason For Termination Was A Pretext For Discrimination.............................................................................................25

   D. GPS Is Entitled To Summary Judgment On Count Four, Alleged Violation Of C.G.S. Section 31-51m, Because GPS Was Unaware Plaintiff Had Filed A Complaint With A Public Agency When the Termination Decision was made .........................................................................................................27

        1.      Plaintiff Presents No Evidence Of A Causal Connection Between Her Three Complaints To Public Agencies And Her Termination

        2.      Plaintiff Fails To Present Any Evidence That Genesis' Legitimate Non-Discriminatory Business Reason For Plaintiff's Termination Was Pretext .............................................................................................29

VI.   CONCLUSION.................................................................................................33

# TABLE OF AUTHORITIES

**Page(s)**

CASES

Anderson v. Liberty Lobby, Inc.,
    477 U.S. 242 (1986)..................................................................................................18

Beshty v. GM,
    327 F. Supp. 2d 208 (W.D.N.Y. 2004)..................................................................23

Byrnie v. Town of Cromwell Bd. of Educ.,
    243 F.3d 93 (2d Cir. 2001).....................................................................................26

Collins v. New York City Trans. Auth.,
    305 F.3d 113 (2d Cir. 2002)...................................................................................20

Cruz v. Coach Stores, Inc.,
    202 F.3d 560 (2d Cir. 2000)...................................................................................24

Drummond v. IPC Int'l Inc.,
    400 F. Supp. 2d 521 (E.D.N.Y. 2005) ..................................................................21

Farias v. Instructional Sys., Inc.,
    259 F.3d 91 (2d Cir. 2001).....................................................................................20

Fisher v. Vassar College,
    114 F.3d 1332 (2d Cir. 1997).................................................................................20

Fleming v. MaxMara USA, Inc.,
    371 F.Appx. 115 (2d Cir. 2010).............................................................................27

Ghent v. Moore,
    324 F.Appx. 55 (2d Cir. 2009)...............................................................................26

Grady v. Affiliated Central, Inc.,
    130 F.3d 553 (2d Cir. 1997)...................................................................................22

Johnson v. County of Nassau,
    480 F.Supp. 2d 581 (E.D.N.Y. 2007) ...................................................................23

LaFond v. General Physics Services Corp.,
    50 F.3d 165 (2d Cir. 1995)...............................................................................28, 29

Levy v. CHRO,
    236 Conn. 96 (1996) ..............................................................................................19

Marro v. Nicholson,
　　Civil No. 06-CV-6644 (JFB) (ARL), 2008 U.S. Dist. LEXIS 19272 (E.D.N.Y. Mar.
　　12, 2008) ..................................................................................................................23

McCarthy v. Dun & Bradstreet Corp.,
　　482 F.3d 184 (2d Cir. 2007)......................................................................................19

McDonnell Douglas Corp. v. Green,
　　411 U.S. 792 (1973).........................................................................................19, 20, 28

Norton v. Sam's Club,
　　145 F.3d 114 (2d Cir. 1998).......................................................................................26

Osborn v. Home Depot U.S.A, Inc.,
　　518 F. Supp. 2d 377 (D.Conn. 2007).........................................................................19

Price Waterhouse v. Hopkins,
　　490 U.S. 228 (1989)..............................................................................................23, 24

Reeves v. Sanderson Plumbing Prods., Inc.,
　　530 U.S. 133 (2000)..............................................................................................20, 21

Rigano v. Honey Hill Care Center,
　　No. CV0300195692S, 2005 Conn. Super. LEXIS 1705 (Conn. Sup. Ct. May 24,
　　2005) ..........................................................................................................................28

Ritz v. Town of East Hartford,
　　110 F. Supp. 2d 94 (D. Conn. 2000).........................................................................28

Schoonmaker v. Lawrence Brunoli Inc, et al.,
　　265 Conn. 210 (2003) ...............................................................................................28

Scott v. Harris,
　　550 U.S. 372 (2007).................................................................................................19

Spiegel v. Schulmann,
　　604 F.3d 72 (2d Cir. 2010).......................................................................................19

Texas Dept. of Community Affairs v. Burdine,
　　450 U.S. 248 (1981)..................................................................................................20

Weinstock v. Columbia University,
　　224 F.3d 33 (2d Cir. 2000)...................................................................................24, 26

## I.  INTRODUCTION

Pursuant to Rule 56 of the Federal Rules of Civil Procedure and Local Rule 56 of this District, Defendant Genesis Eldercare Physician Services, Inc. d/b/a Genesis Physician Services ("GPS") hereby moves this Court for an entry of summary judgment as to all three counts of Plaintiff Gayle Gwozdz's operative Amended Complaint dated March 20, 2013 ("Second Amended Complaint").[1]

## II.  SUMMARY

From her first day of work on December 5, 2011 through her mere 66-day tenure (ending on February 9, 2012), Plaintiff was employed by GPS and assigned to work as an at-will Advanced Practice Registered Nurse ("APRN") at Kimberly Hall South ("KHS") skilled nursing facility located in Windsor, Connecticut.[2] Defendant terminated Plaintiff's employment because of various performance and behavioral concerns.

Specifically, almost immediately upon hire Plaintiff was not performing as expected in the APRN role either clinically or interpersonally. Plaintiff's supervisor (Leanne Nadeau) invested an extraordinary amount of time and resources on training Plaintiff to facilitate her transition into the company and to help her understand the expectations of her job throughout her tenure, to no avail. Ms. Nadeau, in consultation with the Human Resources Department, ultimately drafted a Performance Improvement Plan ("PIP") for Plaintiff. When Ms. Nadeau sent the PIP to Plaintiff via email and asked to meet with Plaintiff later that day to discuss it, Plaintiff responded that she would not be able to do so because she had thrown her dog down cement steps and planned to spend the remainder of the day trying to save the dog's life. Upon

---

[1] References to the Second Amended Complaint are cited as "Compl. ¶ __".
[2] Kimberly Hall South is operated by 1 Emerson Drive South Operations LLC. Like GPS, 1Emerson Drive South Operations LLC is a wholly-owned subsidiary of Genesis HealthCare LLC ("GHC").

1

her return to work after that bizarre confession, Plaintiff ignored multiple attempts by Ms. Nadeau and a human resources representative to discuss the PIP and even walked out of the workplace after Ms. Nadeau had driven over an hour there to meet with her. After multiple subsequent attempts by GPS to reach Plaintiff went unanswered, it terminated her employment.

Plaintiff claims her discharge was the result of unlawful gender discrimination. She bases this entirely on the allegation that Ms. Nadeau – an experienced, female Physician's Assistant ("PA") - purportedly said she wanted to hire a male PA to replace Plaintiff because a male would be better able to manage the nursing staff. Neither logic nor the record evidence – not the least of which is that Ms. Nadeau hired Plaintiff for the job knowing she was female – supports this claim such that Plaintiff can sustain even her *prima facie* burden.

Plaintiff's only other claim is that the content of the nearly daily emails she sent to Ms. Nadeau detailing the routine vicissitudes of her workday constituted actionable "whistleblower" complaints in retaliation for which GPS terminated her employment. As an initial matter, this claim is fatally flawed because it is based entirely on Plaintiff's internal complaints, which do not constitute "reports to a public body" as required to pursue a claim under Conn. Gen. Stat. Sec. 31-51m. Beyond that, even if they were viewed as such, the termination decision-makers did not decide to discharge Plaintiff upon review of the few of her emails Ms. Nadeau forwarded to them – to the contrary, they sought to discuss the ways in which they and Ms. Nadeau could help Plaintiff improve her performance. The undisputed, material facts are that it was only after Plaintiff's performance was woefully deficient - *and* after Plaintiff refused to discuss performance improvement with her supervisor - *and* after Plaintiff, a healthcare provider to the elderly and infirm, sent an email confessing she had thrown a dog down cement steps - that GPS made the termination decision. Each one of Plaintiff's acts was a

2

legitimate business reason to terminate her at-will employment; combined, there was clearly no need for nor actual pretext in the decision-making process. For all of these reasons, GPS respectfully requests that this Court summarily dismiss all three remaining counts of the Complaint in this matter.

III.    FACTUAL BACKGROUND

   A.    GPS Is An Equal Opportunity Employer & Fosters An Open Door Policy Of Communication

GPS has adopted Genesis HealthCare's ("GHC") policies and procedures as its own and is committed to adherence to its Equal Employment Opportunity policy, which states in relevant part that:

> Employment decisions will be made without regard to race, color, religion, gender, sexual orientation, national origin, age, disability, marital status, genetic information, amnesty or status as covered veterans in accordance with federal, state and local laws.

(Deposition Testimony of Plaintiff "Pl. Dep." 24, Ex. 5).[3]

   B.    Genesis Physician Services' Relationship With Genesis Healthcare

GPS employs certain of the clinical staff at the company's skilled nursing facilities around the country. (Deposition Testimony of Jane Keithley "Keithley Dep." 19-22, 143).[4] Specifically, GPS employs the APRNs (or "Nurse Practitioners"), PAs, the individuals who directly supervise those roles - in GPS nomenclature, "Area Clinical Practice Managers" – and their supervisor's managers who hold the title "Director of Clinical Practice." (Deposition

---

[3] A certified copy of referenced pages and authenticated exhibits from the transcript of Plaintiff's May 16 and 27, 2014 deposition is attached to Defendant's Rule 56(a)1 Statement at Tab C and referenced as "Pl. Dep."
[4] A certified copy of referenced pages and authenticated exhibits from the transcript of Jane Keithley's May 30, 2013 deposition is attached to Defendant's Rule 56(a)1 Statement at Tab A and referenced as "Keithley Dep.".

Testimony of Leanne Nadeau "Nadeau Dep." 18-20).[5]  This also includes the physicians and their associated medical staff.  (Keithley Dep. at 21).  Various subsidiaries of GHC employ center administrative and nursing staff below the APRN level.  (Keithley Dep. 21).

The Area Clinical Practice Managers who directly supervise the APRNs are typically former PAs or APRNs themselves.  Their job is to ensure a healthy working relationship between the APRNs/PAs and the nursing home staff.  (Nadeau Dep. 20-21).  Area Clinical Practice Managers have supervisory responsibility for the APRN/PAs working in a number of centers throughout their assigned region.  (Nadeau Dep. 19-20).  They work out of their homes and communicate via email or telephone with those they supervise as necessary, as well as in person when on a regular visit to a center.  (Nadeau Dep. 17).

C.    Plaintiff's 66-Day, At-Will, Probationary Employment Tenure

1.    The Decision To Hire An APRN At KHS

Ms. Nadeau, a practicing PA, began working in the management role of Area Clinical Practice Manager for GPS in September 2011.  (Nadeau Dep. 207-208).  In this role, Ms. Nadeau was responsible for the supervision of all PAs and APRNs in 15 GHC-affiliated centers in New England.  (Nadeau Dep. 19-21).  Ms. Nadeau reported to Flora Petillo, the Director of Clinical Practice who was also employed by GPS in her assigned region.  (Nadeau Dep. 17).  In her first weeks in this role, Ms. Nadeau met with the administrators of the Centers in her region, including the KHS Administrator Tania Archambault along with the KHS Director of Nursing Services, Florence Bolella.[6]  (Nadeau Dep. 30-31).  During this meeting, Ms. Archambault and Ms. Bolella expressed their desire to have a full time APRN at KHS and tasked

---

[5] A certified copy of referenced pages and authenticated exhibits from the transcript of Leanne Nadeau's deposition is attached at to Defendant's Rule 56(a)1 Statement at Tab B and referenced as "Nadeau Dep.".
[6] During the relevant time period both Ms. Archambault and Ms. Bolella were employees of 1 Emerson Drive South Operations LLC.

Ms. Nadeau with hiring one. (Nadeau Dep. 30-32). Accordingly, Ms. Nadeau, in conjunction with Ms. Petillo, interviewed candidates and ultimately made the decision to hire Plaintiff for the APRN position at KHS. (Nadeau Dep. 30).

### 2. Plaintiff's APRN Role At Award-Winning Kimberly Hall South

Plaintiff was assigned by GPS to work at KHS as an at-will APRN on December 5, 2011. (Pl. Dep. 21, Ex. 3). KHS is a skilled nursing facility that specializes in the care of both sub-acute and long-term care of elderly, infirm residents. (Deposition Testimony of Florence Bolella "Bolella Dep." 68-70).[7]

As an APRN, it was Plaintiff's job to work in collaboration with the physicians on patient care and to be a resource for the nursing staff. (Pl. Dep. 21-22, Ex. 4). The APRN role is a more skilled level of nursing care than that of the Registered Nurses and other nursing staff working at KHS, and as such, it was also Plaintiff's role to educate the nurses as well as to identify and correct any patient nursing care concerns. (Bolella Dep. 42-50). Plaintiff came to KHS with many years of experience as, and education in, the APRN practice. (Pl. Dep. 8, Ex. 2).

### 3. GPS Provided Extensive Orientation And Training To Plaintiff

Like all GPS employees, per company policy, Plaintiff's first 90 days of employment were probationary in nature. (Pl. Dep. 24-25, Ex. 5). GPS' probationary employment period is designed to allow new employees the opportunity to decide if a center is the right work environment and for GPS to evaluate performance and ensure the new employee is "[s]killed, dedicated and compassionate." (Id.). Along with her Offer Letter (dated October 27, 2011), GPS mailed Plaintiff a copy of its Employee Handbook that contained this

---

[7] A certified copy of referenced pages and authenticated exhibits from the transcript of Florence Bolella's May 28, 2014 deposition is attached to Defendant's Rule 56(a)1 Statement at Tab D and referenced as "Bolella Dep."

probationary period policy, as well as its Equal Employment Opportunity policy. (Id.). Plaintiff acknowledged receipt of these policies, as well as the at-will nature of her employment, by signing and returning verification of same dated October 29, 2011. (Pl. Dep. 25-27, Ex. 6).

As an experienced APRN, GPS' expectation was that Plaintiff, like other experienced APRNs, would undergo some training to orient her to company-specific practices and then would begin seeing patients at her assigned center. (Keithley Dep. 48-49; Nadeau Dep. 34-42). To that end, GPS provided Plaintiff with an in-person corporate orientation spanning two days from November 30 to December 1, 2011. (Pl. Dep. 43-44, Ex. 9). During this extensive orientation, GPS indoctrinated Plaintiff not only in the APRN role, but also on company philosophy, center management, documentation requirements, and overall company expectations. (Id.). When Plaintiff arrived for her first work day at KHS, the nurse educator there provided her with additional training resources, including center protocols on everything from HIPPA requirements to resident rights to fire safety. (Pl. Dep. 32-37, Ex. 8).

In addition to the corporate orientation and the KHS-specific education, Ms. Nadeau, now Plaintiff's immediate supervisor, coordinated a number of computer module-based trainings for Plaintiff. (Nadeau Dep. 40-41). Also by way of training, Ms. Nadeau organized the opportunity for Plaintiff to shadow an APRN at another GHC-affiliated center. (Nadeau Dep. 102-104). This "shadowing" was relatively standard training for new APRNs, which was designed on the expectation that s/he would use the opportunity to become familiar with how a GHC affiliated center ran. (Nadeau Dep. 38-52). Ms. Nadeau's expectation was that Plaintiff would shadow for a few days and then begin seeing patients at KHS, as was the typical process. (Nadeau Dep. 100-104).

4.  Plaintiff's First Weeks On The Job And Additional Training

Plaintiff arrived for a "meet and greet", as she describes it, at KHS on her first day of employment, December 5, 2011. (Pl. Dep. 40). At 8:48 that evening, she wrote Ms. Nadeau a three page email entitled "U forgot to ask about my day . . . (more bathroom reading)". (Pl. Dep. 50, Ex. 11). In this email, Plaintiff provided an extremely detailed description of each person she met at the center and what her assessment of the individual had been. (Id.). She mentioned that she had gone on rounds with a physician and had whispered questions to him throughout because she was "afraid that they (were) things (she) should have known." Id.). Ms. Nadeau thought the missive was "strange", but viewed her job as supporting Plaintiff and doing everything in her power to help Plaintiff be successful in her role; she did not comment on that, but instead encouraged Plaintiff to focus on patient care and to stay out of nursing center politics and nursing issues. (Id.; Nadeau Dep. 82-88).

Ms. Nadeau arranged for Plaintiff to shadow the APRN at the Glendale Center during the first days of the following week, beginning on December 12, 2011. (Pl. Dep. 41-43; Nadeau Dep. 103). At Plaintiff's request, she continued shadowing through the end of that week, until December 16, 2011 (Pl. Dep. 59-60, Exs. 12 A-12B; Nadeau Dep. 102-104), except on December 15, 2011, when Ms. Nadeau traveled to KHS to conduct patient rounds with Plaintiff. (Id.). During that day together, Ms. Nadeau offered that she would start having meetings with Florence Bolella, the KHS Director of Nursing, and Tania Archambault, the KHS Administrator, to develop a plan for how best to integrate Plaintiff's APRN role into the facility. (Nadeau Dep. 102-104, Pl. Dep. 59-60, Ex. 12A).

Plaintiff requested that she continue training and shadow another APRN at a different facility, which Ms. Nadeau arranged. (Pl. Dep. 59-60, Ex. 12B). The following week,

beginning on December 19, 2011, Plaintiff began shadowing the APRN at the Harrington Court Center. (Pl. Dep. 59, Ex. 12B). As a result of this extensive shadowing training, Plaintiff's first day in managing patient rounds at KHS was not until Tuesday, December 27, 2011. (Pl. Dep. 64, Ex. 16). With regularity throughout her first week at KHS, Plaintiff continued to send detailed emails and began frequently calling Ms. Nadeau to discuss her minute by minute interactions at the center – often keeping Ms. Nadeau on the phone for one - two hours at seven or eight o'clock at night. (Nadeau Dep. 144). Ms. Nadeau continued to support and to encourage Plaintiff to focus on patient care, with the expectation that she see at least 10-12 patients per day, as was typical. (Nadeau Dep. 89, 117-118; Pl. Dep. 70, Ex. 18).

On January 6, 2012, Ms. Nadeau sent an email to Plaintiff affirming that she was still working on ways to better integrate her with the staff at KHS but cautioned her again that her job was to "[j]ust go in there and see patients and avoid getting involved in any of the nursing and political issues that seem to come up throughout each day." (Pl. Dep. 70, Ex. 18). At this point, over one month into her tenure, Plaintiff had seen a maximum of six patients in one day. (Pl. Dep. 70-71, Ex. 18). Plaintiff responded to her supervisor's email with, in relevant part:

> I don't want you to do anything when I tell you these things, just to be aware that there are still 'issues'. How about this. If I don't say 'I need answers to or help with the following . . . then you don't need to get back to me on the issues. I realize that you have other ducklings to babysit too! Things are on the upswing here . . . don't tell anyone but I think I might be starting to get what Rodney Dangerfield is seeking. (No, not an STD – respect).

(Pl. Dep. 70, Ex. 18). Ms. Nadeau responded that she had spoken with the GHC Regional Vice President about Plaintiff's integration, so hopefully patient care could now be her sole focus. (Pl. Dep. 70, Ex. 18).

5.     <u>Plaintiff's Ongoing Correspondence With Ms. Nadeau</u>

Plaintiff continued to send inappropriate, lengthy messages to Ms. Nadeau about the daily vicissitudes of the workplace. By email dated January 11, 2012 – titled "Up to date – again and another Gayle SUPER note", Plaintiff wrote nearly three pages of laments about how she felt she was being treated personally at KHS, interspersed with odd cracks like "sometimes you feel like a nut, sometimes you don't!" and "the doctors have yet to yell at me for screwing anything up". Plaintiff concluded the email by saying:

> That's it for now. I was having withdrawal symptoms from being too tired now to send you my regular daily volumes of gossip and other crap from KHS." … There are still many frustrating things about how things are done at KHS and certain personalities but the more time I spend with the patients and the docs and the less time I spend listening to nursing problems, the better I feel about the job overall.

(Pl. Dep. 67, Ex. 19).

Plaintiff next sent an email to Ms. Nadeau two days later, on January 13, 2012, titled "I'm not sure I'm the right person for this job." (Pl. Dep. 80-81, Ex. 22). In yet another multi-page missive, Plaintiff continued to lament that she worked harder than the nursing staff, that they were "using" her, and offered a detailed recitation of interactions with co-workers – again, interspersed with such inappropriate comments as she needed to "get the F outta there" and "I just want you to know that if I was up in heaven looking down at me for the past few days, I'd be laughing my ass off. But since I'll be going to a much warmer place (see you there . . .) …". (<u>Id</u>.). Less than three hours after sending this message, Plaintiff sent Ms. Nadeau another two page email containing her now-familiar laments that the nurses were asking her to do too much, that she was tired, and that she was working too hard. (Pl. Dep. 83, Ex. 23). Ms. Nadeau asked Plaintiff to call her that evening to discuss her messages. (Pl. Dep. 85, Ex. 24). In

the ensuing conversation, Plaintiff expressed that she did not like working at KHS and Ms. Nadeau asked Plaintiff if she wanted to try transferring to another center. Ms. Nadeau offered that she could find out if a PA, Gary Miller whom she had interviewed prior and liked, could come to KHS temporarily to help Plaintiff. (Pl. Dep. 86-88, Ex. 24; Nadeau Dep. 189).

Plaintiff sent an email to Ms. Nadeau in follow up to this conversation the next morning, on January 14, 2012. (Pl. Dep. 86-88, Ex. 24). In that message, she noted that a transfer to the Glastonbury center would be closer for her but that she preferred to move to the Glendale center and to try working a four 10-hour day schedule. (Id.). This email, again, was laced with bizarre notes about how her dog, Honey, was going "potty" and out "tramping" the prior evening; about how her sister called her because she had the flu; about how Honey had rummaged through her bag and ruined a highlighter and other non-work-related references. (Id.).

Plaintiff's strange and unprofessional communications continued. On January 17, 2012, she sent Ms. Nadeau a two-page message flippantly titled "Having a great time at KHS. Wish you were here yesterday! (Your expressions would have been priceless . . .)" in which she rambled on about her opinion of the nursing staff -- but began by telling Ms. Nadeau this is "one of those emails best left for bathroom reading." (Pl. Dep. 95, Ex. 25). The following day, on January 18, 2012, Plaintiff sent a three page email in which she again lamented what she believed was the "stupidity" of the GHC staff. (Pl. Dep. 97, Ex. 26). Plaintiff included information about medication she was taking and that she had diarrhea, along with a note that her dog, Honey, was "fartin' up a storm" that morning. (Id.). She stated she "does not know how (Ms. Nadeau) puts up with (her) complaining." (Id.). Plaintiff closed the email by apologizing to Ms. Nadeau that she was "not able to do a better job" for her. (Id.).

On January 19, 2012, Plaintiff sent Ms. Nadeau an email titled "Out of Work Today Too (better, can human walk 10 Ft duck walk 10 ft)". (Pl. Dep. 100, Ex. 27). Although she had not been in the facility, Plaintiff wrote two pages of email content to her supervisor containing strange descriptions of personal matters - like how she slept on the couch for a full year so Honey could sleep near her; how her furnace had been broken but was now fixed; how she ate toast while sitting in the bathroom, and other odd notes. (Id.). Plaintiff concluded the email by telling Ms. Nadeau:

> I feel so bad that when you hired me you also got so much baggage . . . I promise that after 4/1/12 I will become the "perfect" employee.

(Id.).

### 6.  GPS' Further Attempts To Support Plaintiff By Having The Center Thoroughly Review Any Nursing Concerns She Identified

Throughout this time period, Florence Bolella, the Director of Nursing who has worked at KHS for over two decades, was looking into any comments Plaintiff made either directly to her or forwarded via Ms. Nadeau, about any patient care/nursing issues. (Bolella Dep. 126-127). Indeed, as Ms. Bolella testified, it was Plaintiff's role as an APRN to identify and report on any patient care issues or needs for nursing education to her, and Ms. Bolella appreciated and took each comment seriously and investigated it thoroughly. (Bolella Dep. 131-132). When Plaintiff reported that she felt the nurses had improperly cared for a patient's feeding tube, for example, Ms. Bolella assessed the medical records and spoke with the nurses involved and found no wrongdoing. (Bolella Dep. 126-130). When Plaintiff commented that she did not like how the nurses handled a situation wherein two patients were physical with one another, Ms. Bolella again investigated and found there to be no wrongdoing. (Bolella Dep. 130). On occasion, Ms. Bolella and Plaintiff had clinical differences of opinion relating to

11

patient care as well - for instance, Plaintiff took issue with Ms. Bolella's opinion that a patient should not have been hospitalized after a fall. (Bolella Dep. 100). Ms. Bolella explained to Plaintiff that the patient was under a strict "do-not-hospitalize" order but also told Plaintiff that she had contacted the treating physician and the family after the fall nonetheless. (Bolella Dep. 100-105). When Plaintiff complained to Ms. Bolella about the fact the nurses were not using the APRN log she was attempting to institute and that labwork was not being processed in a timely manner, Ms. Bolella and Ms. Nadeau worked to address these issues – all while nurses and staff were complaining to Ms. Bolella about Plaintiff and her performance deficiencies. (Bolella Dep. 118-119; 107-110). Specifically, Plaintiff's inappropriate and unprofessional tone was reflected not only in the copious emails Plaintiff sent, but her verbal interactions with clinical staff as well. (Nadeau Dep. 218, Ex. HH). Plaintiff's productivity needed improvement as she was not meeting the expected 8 to 12 patient visits per day and her progress note completion rate was deficient. (Id.). Plaintiff's clinical competencies were also lacking and she needed to improve upon performing effective exams and developing treatment plans for patients, assisting clinical staff in urgent situations and knowing when to seek proper consultation with physicians when clinical questions arose. (Id.)

       7.    A Nurse Complains That Plaintiff Is Sleeping On The Job

On Tuesday, January 24, 2012, a member of the KHS nursing staff, Cathy Lord, reported to Ms. Bolella that she had witnessed Plaintiff asleep during what Ms. Lord believed were Plaintiff's work hours. (Bolella Dep. 200). Per the instruction of Jane Keithley, a GPS Human Resources Manager, Ms. Bolella began collecting written statements from the nursing staff who were at KHS that day. (Bolella Dep. 152). Ms. Bolella relayed that information to Ms. Keithley. (Keithley Dep. 112).

On January 27, 2012, Ms. Keithley contacted Plaintiff to discuss the complaint about her sleeping on the job. (Keithley Dep. 106-107). By this point in time, Ms. Keithley was familiar with Plaintiff because Ms. Nadeau had contacted her in mid-January to discuss how to handle Plaintiff's odd behavior and ineffective job performance and the two had been speaking regularly on topic since that time. (Keithley Dep. 39). In fact, on Ms. Keithley's advice, Ms. Nadeau was at the time drafting a Performance Improvement Plan for Plaintiff. (Nadeau Dep. 217-219). During Ms. Keithley's conversation with Plaintiff about the sleeping complaint, Plaintiff identified two nurses, Debra Rafala and Chi Chi Sherpa, whom she stated saw her in the break room on the day in question.[8]  Plaintiff described to Ms. Keithley that she was on a lunch break at the time and had laid her head down to rest for a few moments. (Keithley Dep. 112-113, Ex. V). Ms. Keithley accepted that explanation, advised Plaintiff to make it more clear in the future that she was on a break if she needed to rest, and closed the investigation without issuing any discipline or other repercussion on Plaintiff. (Keithley Dep. 15, 112-113).

8.    Meetings with KHS Management To Help Plaintiff Integrate And Perform More Effectively

In the interim, in her continued attempt to help Plaintiff succeed, Ms. Nadeau had scheduled a meeting between herself, Plaintiff, Ms. Bolella, Marie Brennan, Transitional Care Unit Manager at KHS, and Anthony Costa, Clinical Operations Director for GPS, for Wednesday, January 25, 2012. (Nadeau Dep. 168-174). The purpose of the meeting was part of Ms. Nadeau's ongoing effort to facilitate communication between Plaintiff and KHS staff to ensure patient care needs were most effectively met – with a plan to meet for this purpose

---

[8] Interestingly, two days after Ms. Rafala and Ms. Sherpa saw Plaintiff sleeping on the job, Plaintiff filed a complaint with the Board of Nursing Examiners against Ms. Rafala – but in which she identified Ms. Sherpa in an unflattering manner - accusing Ms. Rafala of bad nursing practices due to "nicotine addiction" because she took smoking breaks throughout the workday. (Pl. Dep. 169-170, Ex. 40).

weekly from that point forward. (Nadeau Dep. 169-174; Bolella Dep. 116-120). Plaintiff sent Ms. Nadeau a three page email following this meeting, in which she ranted about the meeting dialogue and made preposterous statements like: "You/Genesis management have made me the fall person for every possible thing that goes wrong with a patient in the building . . .". (Pl. Dep. 126, Ex. 28). Plaintiff concluded the email by indicating she would work the shifts offered at the Glendale and/or Glastonbury centers if that offer was still available; that she would take a "lay off"; and that she was "willing to be fired at this point" because she was "clearly not meeting their needs." (Id.). Plaintiff wrote that they were "only treating (her) this way because (she) (is) a nurse" and concluded the email with "I need to get out a.s.a.p.!" (Id.).

9.    Plaintiff's Communication With Human Resources

Thereafter, Plaintiff sent two emails to Ms. Keithley in which she essentially regurgitated the laments she had been sharing with Ms. Nadeau over her mere weeks of working at KHS. (Pl. Dep. 143,145, Exs. 30, 32).[9] On February 1, 2012, Ms. Keithley forwarded these two emails to Ms. Nadeau - with whom, as noted, she had been discussing Plaintiff's performance management on an ongoing basis. (Nadeau Dep. 180, Ex. DD). Ms. Nadeau responded by expressing her frustration about Plaintiff's emails to Ms. Keithley, noting that she was working on an ongoing basis to integrate Plaintiff at KHS and to address what Plaintiff viewed as an uneducated nursing staff there. (Id). Plaintiff mentioned in one of her emails to Ms. Keithley that she had been asked to "hold out" and not transfer from KHS until GPS "hires a male PA". (Id.).

Ms. Nadeau noted to Ms. Keithley that this, like so many other of Plaintiff's characterizations and perceptions, was completely misconstrued. (Nadeau Dep. 180, Ex. DD).

---

[9] A number of email messages that Plaintiff had drafted earlier did not transmit to recipients until February 1, 2012 at 8:30 am due to an apparent server connectivity issue.

Ms. Nadeau explained that during one of her myriad conversations with Plaintiff about ongoing performance issues, in an attempt to make Plaintiff feel validated, she offered that Plaintiff might just not be the "right match" for "the personality" of KHS and if she could work it out to replace Plaintiff, perhaps a transfer made sense. (Id.). Ms. Nadeau described Gary Miller to Plaintiff, said she had liked him and would ask if he had any interest in covering Plaintiff's duties at KHS so she could transfer before they hired someone new. (Id.). In the midst of this conversation about Center "personalities", Ms. Nadeau relayed the story to Plaintiff about how another Center had asked if she would hire a male because they thought that gender would be a better fit, and how Ms. Nadeau responded by educating Center management that it was not gender or anything other than personality of the individual and its match to the Center that mattered. (Nadeau Dep. 182-185). Ms. Nadeau pointed out that she hired a female APRN for that facility and it had worked out fabulously. (Nadeau Dep. 185).

10. Delivery Of The PIP And Plaintiff's Response That She Had Thrown Her Dog Down Cement Stairs

Ms. Nadeau ultimately completed the PIP on which she had been working for approximately a week on February 3, 2012. (Nadeau Dep. 218, Ex. HH). GPS' PIP process is used as a tool company-wide as a way to articulate performance concerns and identify specifically what the employee can do to alleviate those concerns. (Nadeau Dep. 218, Ex. HH). A PIP is not disciplinary in nature; to the contrary, it is a reflection of an investment in the employee to steer him/her in a constructive manner. (Id.). Ms. Nadeau sent Plaintiff the PIP via email before her scheduled work day on Friday, February 3, 2012 to give her time to review it prior to discussing it later that day. (Nadeau Dep. 218, Ex. HH). Plaintiff responded with an email in which she stated that he had thrown her dog down her front cement steps and was going

to spend the day trying to save the dog's life. (Pl. Dep. 155, Ex. 37).

           11.    Plaintiff's Refusal To Discuss The PIP

Plaintiff sent this email to Ms. Nadeau, Ms. Keithley and Ms. Nadeau's supervisor, Flora Petillo. (Pl. Dep. 155, Ex. 37). All three recipients were alarmed by its content and extremely troubled that an employee in whom they entrusted the care of elderly and infirm patients would throw her pet down cement steps. (Keithley Dep. 121). They decided, however, that they would give Plaintiff the opportunity to explain the note and, assuming she did so, they would issue the PIP and work with her on her overall professional demeanor and actions. (Keithley Dep. 121; Pl. Dep. 155, Ex. 37; Nadeau Dep. 224-225, Ex. KK). On Tuesday, February 7, 2012, Ms. Keithley contacted Plaintiff to schedule a meeting toward this end. (Id.). Plaintiff responded that she would not meet without her attorney present. (Keithley Dep. 113-114, Ex. W; Nadeau Dep. 224-225, Ex. KK). Ms. Keithley responded that she would have to ask whether that was appropriate and would contact Plaintiff once she had done so. (Keithley Dep. 123; Nadeau Dep. 224-225, Ex. KK).

On Wednesday, February 8, 2012, Ms. Keithley called Plaintiff at KHS with the intent of informing her that she was not to have an attorney present and that Ms. Nadeau was driving to KHS that afternoon so the two of them could call Ms. Keithley and discuss the PIP. (Keithley Dep. 118-120,122-124). The nurses' station to which Ms. Keithley was transferred confirmed that Plaintiff was in the building and that she had been paged, but Plaintiff did not come to the phone for one half hour, after which Ms. Keithley hung up. (Keithley Dep. 119, 151). When she knew Ms. Nadeau must have arrived at KHS later that day, Ms. Keithley called her on her cell phone. (Keithley Dep. 124) Ms. Nadeau reported that Plaintiff was in the building but was refusing to talk to her and/or Ms. Keithley. (Keithley Dep. 124; Nadeau Dep.

229-230). At one point Ms. Keithley heard Ms. Nadeau talking with Plaintiff and confirmed Plaintiff was refusing to have a discussion with either of them about the PIP. Plaintiff then walked out of the Center. (Keithley Dep. 124, 149; Nadeau Dep. 229-230).

12.    The Termination Of Plaintiff's Employment

Ms. Keithley called and left messages for Plaintiff on both her home and cell phone lines on the following day, Thursday, February 9, 2012. (Keithley Dep. 113-114, 157-158, Ex. W). Ms. Keithley called and left messages for Plaintiff again on Monday, February 13, 2012. (Keithley Dep. 113-114, 157, Ex. W). When no one had heard from Plaintiff as of Wednesday, February 15, 2012, the decision was made by Ms. Keithley, with approval from her supervisors and Ms. Nadeau's supervisor Flora Petillo, to terminate her employment. (Keithley Dep. 157-161). GPS notified Plaintiff of the termination of her employment via letter dated February 15, 2012, in which it noted that her termination was effective as of February 9, 2012 because the last day she was physically present in the Center was February 8, 2012. (Pl. Dep. 162, Ex. 38, Keithley Dep. 155). Ms. Nadeau did not know Plaintiff's employment had been terminated until she saw a copy of the termination letter. (Nadeau Dep. 226-228).

13.    The Complaints Plaintiff Filed With Public Agencies About Which No One at GPS Was Aware Until After Her Termination

Unbeknownst to anyone at GPS, much less any of the decision-makers at the time of termination, via letters dated Saturday, February 4, 2012 and Sunday, February 5, 2012 Plaintiff had filed complaints against KHS with the OSHA branch of the Connecticut Department of Labor and with the state Department of Public Health, respectively. (Pl. Dep. 166-167, 170, Exs. 41-42).

IV. PROCEDURAL POSTURE

Plaintiff initiated this lawsuit on March 8, 2013 and then filed an Amended Complaint on March 20, 2013. On May 30, 2013, Defendant moved to dismiss Counts Three and Four of the Amended Complaint, alleging violations of C.G.S. Sec. 31-51q and C.G.S. Sec. 31-51m respectively. On October 10, 2013, Plaintiff filed the operative Second Amended Complaint. By decision dated March 11, 2014, the Court (Thompson, J.) granted Defendant's motion in part and dismissed Plaintiff's alleged violation of C.G.S. Sec. 31-51q as legally unsustainable, holding that the speech upon which Plaintiff attempted to base Count Three was not protected as it was merely regarding her ability "to properly execute her duties as an APRN at Kimberly Hall." (Doc. No. 31). Plaintiff moved to amend her complaint for a fourth time on April 28, 2014; the Court denied that motion on May 1, 2014.

Plaintiff's operative Second Amended Complaint alleges the following counts:

| COUNT ONE: | Gender Discrimination in Violation of Title VII of the Civil Rights Act of 1964; |
| COUNT TWO: | Gender Discrimination in Violation of the Connecticut Fair Employment Practices Act, C.G.S. Sec. 46a-60(a)(1); |
| COUNT FOUR: | Violation of Connecticut's "Whistleblower" Statute, C.G.S. Sec. 31-51m |

V. ANALYSIS

A. Summary Judgment Standard

Rule 56(c) of the Federal Rules of Civil Procedure provides that a party is entitled to summary judgment if "there is no genuine issue of material fact and . . . the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). "[T]he mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; its requirement is that there be no genuine issue of material fact." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247-48 (1986) (citations omitted; emphasis in

original). For purposes of a motion for summary judgment, a fact is "material" if it "might affect the outcome of the suit under the governing law." Id. at 248. An issue of fact is "genuine" if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Id.

Once "the moving party has carried its burden under Rule 56(q), its opponent must do more than simply show that there is some metaphysical doubt as to the material facts. . . . [T]he mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." Scott v. Harris, 550 U.S. 372, 380 (2007) (emphasis in original; citation omitted). An employer is entitled to summary judgment "unless the plaintiff can point to evidence that reasonably supports a finding of prohibited discrimination." Spiegel v. Schulmann, 604 F.3d 72, 80 (2d Cir. 2010). "The non-moving party may not rely on mere conclusory allegations nor speculation, but instead must offer some hard evidence showing that its version of the events is not wholly fanciful." McCarthy v. Dun & Bradstreet Corp., 482 F.3d 184, 202 (2d Cir. 2007).

B. The Applicable Legal Analysis Dictates That Genesis Is Entitled To Summary Dismissal As A Matter Of Law On Plaintiff's Claim Of Gender Discrimination Under Both Federal And State Law

To survive summary judgment on her claim of gender discrimination brought under both federal and state law, Plaintiff must demonstrate an inference of discrimination under the three-tiered, burden-shifting test established in McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973) and its progeny. See also Osborn v. Home Depot U.S.A. Inc., 518 F. Supp. 2d 377, 389 (D.Conn. 2007) (applying McDonnell Douglas burden-shifting framework to gender discrimination claims under Title VII and CFEPA); Levy v. CHRO, 236 Conn. 96, 103 (1996)

(Connecticut courts look to federal court precedent for guidance in enforcing Connecticut's antidiscrimination statutes).

Under the first tier of this test, Plaintiff is required to present a *prima facie* case of discrimination by demonstrating that: (1) she is a member of a protected class; (2) she was qualified for the position; and (3) she was subjected to an adverse employment decision under circumstances giving rise to an inference of discrimination. McDonnell Douglas Corp., 411 U.S. at 802; Collins v. New York City Trans. Auth., 305 F.3d 113, 118 (2d Cir. 2002) (internal citations omitted).

If Plaintiff establishes a *prima facie* case, the burden then shifts to Defendant to articulate a legitimate, non-discriminatory reason for the adverse employment action. Reeves v. Sanderson Plumbing Prods., Inc., 530 U.S. 133, 142 (2000) (citation omitted). At this stage, Defendant need only proffer, not prove, the existence of a non-discriminatory reason for Plaintiff's discharge. Texas Dept. of Community Affairs v. Burdine, 450 U.S. 248, 255-256 (1981); see Fisher v. Vassar College, 114 F.3d 1332, 1337 (2d Cir. 1997) (holding that the presumption of discrimination disappears once the employer has proffered a legitimate business reason for the adverse action).

Once Defendant has met its burden of production, Plaintiff must demonstrate that the legitimate reasons offered by Defendant were not the true reasons for the adverse action, but were instead merely a pretext for impermissible discrimination. Reeves, 530 U.S. at 143; see Farias v. Instructional Sys., Inc., 259 F.3d 91, 99 (2d Cir. 2001) (granting summary judgment because plaintiff did not produce evidence of race/national origin discrimination to rebut defendant's non-discriminatory reason for its actions). "Although the intermediate evidentiary burden shifts back and forth under this framework, the ultimate burden of persuading the trier of

fact that the defendant intentionally discriminated against the plaintiff remains at all times with the plaintiff." Reeves, 530 U.S. at 143 (citation omitted; internal quotations omitted).

C.    GPS Is Entitled To Summary Judgment On Counts One And Two Because Plaintiff Fails To Demonstrate A *Prima Facie* Case Of Gender Discrimination

Plaintiff cannot demonstrate a *prima facie* case of gender discrimination because she presents no evidence that she was subjected to an adverse employment decision under circumstances giving rise to an inference of discrimination. Plaintiff's managers and those making the decision to terminate were in the same protected class as Plaintiff, refuting any inference of discriminatory animus. One of the two individuals Plaintiff claims harbored discriminatory animus is also female and had hired Plaintiff – with the knowledge, of course, that she was female - a mere three months prior to making the decision to terminate her. Plaintiff's attempt to base a gender discrimination claim on the allegation that Ms. Nadeau made one comment about a male PA is similarly unmeritorious, as even if true it is nothing more than a stray remark by a non-decisionmaker and, to the extent Plaintiff relies upon this remark to support a claim of "gender stereotyping", that argument because the alleged remark was made in the context of helping her succeed, not in relation to the termination of her employment.

1.    Plaintiff's Managers And The Termination Decision-makers Were In The Same Protected Class As Plaintiff And Had Made The Decision To Hire Her Just Four Months Prior

As an initial matter, GPS is entitled to the inference against any claim of gender discrimination in this case because the employees involved in managing Plaintiff and the decision to terminate her employment – Ms. Keithley and Ms. Petillo - were also female. *See* Drummond v. IPC Int'l Inc., 400 F. Supp. 2d 521, 532 (E.D.N.Y. 2005) (Identifying the "[w]ell-recognized inference against discrimination exists where the person who participated in the

allegedly adverse decision is also a member of the same protected class.") (*citing* Toliver v. Community Action Comm'n to Help the Economy, Inc., 613 F. Supp. 1070, 1074 (S.D.N.Y. 1985) for the proposition that "if a decision maker is in same protected class as plaintiff, claims of discrimination become less plausible").

GPS is also entitled to the "same actor" inference undermining the notion that discrimination motivated the termination decision where the same person was involved in both the hiring and firing decisions, particularly where, as here, the intervening employment was than four months. *See, e.g.*, Grady v. Affiliated Central, Inc., 130 F.3d 553, 560 (2d Cir. 1997) (when the person making the decision to hire and fire is one in the same, it is difficult to impute discriminatory animus, especially when the firing occurred only a short time after the hiring). Here, Ms. Petillo approved the hire of Plaintiff just four months prior to approving the decision to terminate her – knowing the entire time, of course, that Plaintiff was female. (Nadeau Dep. 30). Both inferences weigh heavily in favor of summarily dismissing Plaintiff's claims of gender discrimination.

    2.   The Sole Remark Alleged By Plaintiff In Support Of Her Gender Discrimination Claim Does Not Give Rise To An Inference Of Discrimination

        a.   One Discrete Comment Made By A Non-Decision Maker Is A "Stray Remark"

Even if it were true, Plaintiff's allegation that Ms. Nadeau demonstrated gender animus when she purportedly said she would ask a male PA to work at KHS in order to "straighten things out" because nurses would be less likely to "tug on his heartstrings" is insufficient to sustain Plaintiff's claim of gender discrimination. (*See* Pl. Dep. 86-90, 174-175). The purported comment is immaterial to the analysis of whether Plaintiff's termination was motivated by her gender because Ms. Nadeau was undeniably not involved in the termination

decision. (*See* Nadeau Dep. 226-227). Consequently, Ms. Nadeau's alleged comment is a textbook "stray remark", insufficient to demonstrate discrimination. *See* Marro v. Nicholson, Civil No. 06-CV-6644 (JFB) (ARL), 2008 U.S. Dist. LEXIS 19272, at *29-31 (E.D.N.Y. Mar. 12, 2008) (holding that comments made by a non-decisionmaker cannot constitute evidence of discrimination;[10] Johnson v. County of Nassau, 480 F.Supp. 2d 581, 599 (E.D.N.Y. 2007) ("In order for [stray] remarks to be deemed significant, the plaintiff must show their nexus to the adverse employment decision") (internal citations omitted); Beshty v. GM, 327 F. Supp. 2d 208, 213 (W.D.N.Y. 2004) (holding that an arguably discriminatory remark made by someone who had no involvement in the plaintiff's termination was insufficient to demonstrate discrimination).

>   b. To The Extent Plaintiff Relies On *Price Waterhouse* To Support Her Gender Discrimination Claim, She Fails To Establish Any Gender Stereotyping, Let Alone Stereotyping That Led To Her Termination

Notwithstanding that this purported remark is an immaterial, stray remark by a non-decision maker, to the extent Plaintiff attempts to use it to pursue a claim similar to that of "gender stereotyping" in the manner recognized by the U.S. Supreme Court in *Price Waterhouse v. Hopkins,* this attempt also fails. Price Waterhouse v. Hopkins, 490 U.S. 228, 251 (1989). In *Price Waterhouse,* the plaintiff established that in making the decision not to award partnership, the male evaluators relied upon stereotypes that the female plaintiff was abrasive, had been "acting masculine", and that she could improve her chances of partnership "by walking, talking and dressing more femininely". Id. at 235. There, the defendant did not deny that these stereotypes played a role in the decision. Id. at 251.

Here, Plaintiff does not, nor can she, present any evidence that GPS relied upon any gender stereotypes in making the decision to terminate her and her claim fails as a result.

---

[10] Copies of unreported LEXIS cases are attached hereto as Exhibit 1.

The alleged "heartstrings" comment by Ms. Nadeau, was per Plaintiff's own allegation made in the context of discussing ways to help Plaintiff succeed, not to terminate her. (Pl. Dep. 88-89). Even if this one stray remark was made, it is insufficient to establish a *prima facie* case of gender discrimination even if based on sexual stereotypes. *See* Price Waterhouse, 490 U.S. at 251 (noting that had the stereotyping merely consisted of stray remarks, it would be insufficient to prove gender discrimination); *see also* Weinstock v. Columbia University, 224 F.3d 33 (2d Cir. 2000) (upholding summary judgment for employer, noting that even if committee reviewing plaintiff's tenure application used the words "nice" and nurturing" in describing the plaintiff, such words, even if gender stereotypes, were not used to describe the plaintiff's research, which was the reason for plaintiff's tenure denial; rather, the words were allegedly used in describing the plaintiff's teaching, which did not form a basis for the decision); see also Cruz v. Coach Stores, Inc., 202 F.3d 560, 573 (2d Cir. 2000) (upholding dismissal of race claim based on allegations that store preferred "employees with the 'Coach look,' i.e. white and blond" because, even if true, the plaintiff did not demonstrate that this policy had any impact on the decision to terminate).

3. Genesis Had A Legitimate, Non-Discriminatory Business Reason For Terminating Plaintiff's Employment

Even if Plaintiff could establish a *prima facie* case of gender discrimination, GPS' reason for terminating her employment - e.g., because her performance was deficient and her behavior unprofessional and bizarre; because she sent an email stating that she had thrown her dog down cement steps so could not come to work to discuss management's concerns about her bizarre behavior; and because she subsequently then refused to discuss performance improvement with her supervisor or with human resources despite their multiple attempts to do

so – is a legitimate, non-discriminatory business reason for doing so. In fact, each one of these acts was a legitimate, business reason to terminate Plaintiff's employment; combined, they clearly form a valid basis to end the employment relationship.

Moreover, GPS terminated Plaintiff's employment only after months of trying to assist her in succeeding at KHS. (Keithley Dep. 146-162). As the undisputed record evidence demonstrates, Ms. Nadeau devoted an extraordinary amount of time and resources to orient and train Plaintiff to do a job in which she had decades of experience. Even when Plaintiff's performance was deficient and her behavior strange and unprofessional, Ms. Nadeau did not discipline her but instead spent more time crafting a performance improvement tool for her. (Nadeau Dep. 218, Ex. HH). She even went so far as to discuss relocation to an alternative facility with Plaintiff, hoping that she might find a better fit where she could productively do the job for which she was being paid. (Pl Dep. 125, Ex. 28).

### 4. Plaintiff Fails To Show That Genesis' Legitimate, Non-Discriminatory Reason For Termination Was A Pretext For Discrimination

Plaintiff has not and cannot demonstrate that GPS' decision to terminate her employment over her objectively unprofessional and bizarre behavior was a pretext for discrimination. As noted, but cannot be stressed enough, Plaintiff was a healthcare provider in whom GPS entrusted the care of the elderly and infirm and she told her supervisor she had thrown her beloved dog, Honey, down her front cement steps and was going to spend the day trying to save her life. (Pl. Dep. 156, Ex. 37). "To overcome summary judgment, Plaintiff must produce not simply some evidence, but sufficient evidence to support a rational finding that the legitimate, non-discriminatory reasons proffered by the defendant were false, and that more likely than not discrimination was the real reason for the employment action. . . . To get to the

jury, it is not enough . . . to disbelieve the employer; the fact finder must also believe the plaintiff's explanation of intentional discrimination." Weinstock v. Columbia University, 224 F.3d 33, 43 (2d Cir.2000) (internal quotation marks and alterations omitted). In short, a court should not "[i]nfer discrimination from thin air" and a plaintiff must provide more than speculation to defeat summary judgment. *See* Norton v. Sam's Club, 145 F.3d 114, 119 (2d Cir. 1998).

Plaintiff has adduced no evidence demonstrating that GPS' legitimate reason for termination was pretext for gender discrimination. The record reflects that GPS provided Plaintiff ample corporate and on-the-job training upon hire. (Pl. Dep. 41-43, 59-60, Exs. 9,12A and 12B; Nadeau Dep. 102-104). It tolerated her bizarre, long-winded emails; held innumerable meetings, assessed processes by which she might better collaborate with KHS staff, and spent hours on the telephone with her after hours listening to her lament. (Nadeau Dep. 144, Pl. Dep. Exs. 11, 18, 19, 22-27). And even though Plaintiff had only been at KHS for a mere two months, GPS did not rush to terminate; rather, they devoted time to crafting a PIP to structure goals and expectations for her. (Nadeau Dep. 218, Ex. HH). GPS went so far as to discuss possibly assigning Plaintiff to another location in hopes to assist her with her development. (Pl. Dep. 86-88, Ex. 24). Nothing about these circumstances gives rise to a demonstration that GPS' reasoning for termination was a pretext for discrimination.

And even if there were disagreement about this reasoning, it is well settled that in discrimination cases a fact finder should not serve as a "super-personnel department," reviewing employer disciplinary decisions. *See* Ghent v. Moore, 324 F.Appx. 55, 57 (2d Cir. 2009); Byrnie v. Town of Cromwell Bd. of Educ., 243 F.3d 93, 103 (2d Cir. 2001). "Only where an employer's business decision is so implausible as to call into question its genuineness should [a] court

conclude that a reasonable trier of fact could find that it is pretextual." Fleming v. MaxMara

USA, Inc., 371 F.Appx. 115, 118 (2d Cir. 2010).

For all of these reasons, summary judgment on Counts One and Two of the

Complaint is warranted.

<p style="margin-left:2em;">D.     <u>GPS Is Entitled To Summary Judgment On Count Four, Alleged Violation Of C.G.S. Section 31-51m, Because GPS Was Unaware Plaintiff Had Filed A Complaint With A Public Agency When the Termination Decision was made</u></p>

Plaintiff claims in Count Four of the Complaint that the termination of her

employment was in violation of Conn. Gen. Stat. Sec. 31-51m – colloquially referred to as

Connecticut's "whistleblower" law. C.G.S. Sec. 31-51m provides, in relevant part, that:

> No employer shall discharge, discipline or otherwise penalize any employee because (1) the employee, or a person acting on behalf of the employee, reports, verbally or in writing, a violation or a suspected violation of any state or federal law or regulation or any municipal ordinance or regulation ***to a public body***, . . . . The provisions of this subsection shall not be applicable when the employee knows that such report is false.

(Emphasis added; C.G.S. Sec. 31-51m (b)).

The law defines "public body" as:

> any public agency, as defined in subdivision (1) of section 1-200, or any employee, member or officer thereof, or (B) any federal agency or any employee, member or officer thereof.

C.G.S. 31-51m(a)(4). The referenced subdivision (1) of section 1-200 defines "public agency" as:

> Any executive, administrative or legislative office of the state or any political subdivision of the state and any state or town agency, any department, institution, bureau, board, commission, authority or official of the state or of any city, town, borough, municipal corporation, school district, regional district or other district or other political subdivision of the state, including any committee of, or created by, any such office, subdivision, agency, department, institution, bureau, board, commission, authority or official, and also includes any judicial office, official, or body

27

or committee thereof but only with respect to its or their administrative functions.

C.G.S. Sec. 1-200(1).

In short, C.G.S. Sec. 31-51m protects employees from retaliation by their employer for the act of reporting a suspected legal violation not to the employer itself, but to an outside government agency. Lowe v. Amerigas, Inc., 52 F.Supp. 2d 349, 360 (1999) (granting summary judgment on Plaintiff's Section 31-51m claim because any internal complaints to defendant, a private corporation, means that, as a matter of law, plaintiff did not report any concerns to a public agency as required by statute); see also Schoonmaker v. Lawrence Brunoli Inc, et al., 265 Conn. 210 (2003) (upholding the trial court's award of attorney's fees to defendants where plaintiff brought a Section 31-51m claim based solely on allegations that he complained to a private agency when the statute clearly requires complaints to a "public body").[11]

As to any complaints made to a public body, the McDonnell Douglas analysis applicable to Plaintiff's gender claims applies to her Section 31-51m claim. LaFond v. General Physics Services Corp., 50 F.3d 165, 172 (2d Cir. 1995) (Connecticut courts would apply federal employment discrimination standards to a Section 31-51m claim); Rigano v. Honey Hill Care Center, No. CV0300195692S, 2005 Conn. Super. LEXIS 1705, *5 (Conn. Sup. Ct. May 24, 2005). Plaintiff bears the initial burden "of proving by a preponderance of the evidence of a prima facie case of retaliatory discharge". Ritz v. Town of East Hartford, No. 3:97CV01863110 F. Supp. 2d 94 (D. Conn. 2000). Plaintiff must prove that: (1) she engaged in protected activity

---

[11] To the extent Plaintiff seeks to pursue a claim under C.G.S. Sec. 31-51m on the basis of the email messages she sent to Ms. Nadeau and Ms. Keithley or any conversations she had with other GPS and/or KHS employees, such "complaints" were not made to a public body and are insufficient to form the basis of a statutory claim as a matter of law. Moreover, nothing in these emails reflected anything other than commentary on nursing practices, for which Plaintiff was responsible, and operational notes, which in each instance were corrected as necessary and appropriate.

28

as defined by Section 31-51m; (2) that she was discharged from her employment; and (3) that there was a causal connection between his participation in the protected activity and her termination. Id. at * 5 (citing LaFond, supra, 50 F.3d at 173).

Plaintiff presents no evidence that any reported complaints made to a public body caused GPS to terminate her employment; in fact, she presents no evidence that those making the decision to terminate her had any knowledge whatsoever of Plaintiff's complaints at the time of her termination. Even if Plaintiff could demonstrate the requisite causal element, GPS has proffered a legitimate non-discriminatory reason for Plaintiff's termination and Plaintiff presents no evidence that this reason was merely pretext for retaliation.

1.     Plaintiff Presents No Evidence Of A Causal Connection Between Her Three Complaints To Public Agencies And Her Termination

It is undisputed here that Plaintiff filed three complaints with "public agencies" that potentially qualify as the basis of a claim under the statute:

(1)     Via letter dated January 26, 2012, an anonymous complaint with the Connecticut Board of Examiners for Nursing against Debra Rafala, a non-management LPN (Pl. Dep. 169-170, Ex. 40);

(2)     Via letter dated Saturday, February 5, 2012, a complaint with the Connecticut Department of Public Health (Pl. Dep. 171, Ex. 42); and

(3)     Via handwritten form on which the date February 4, 2012 is written but which was not officially filed with an intake interview until February 15, 2012, a complaint with the OSHA Division of the Connecticut Department of Labor (Pl. Dep. 166, 171, Ex. 41).

As to the first complaint, as Plaintiff concedes and as the undisputed record evidences, she did not file it against GPS and she filed it anonymously. (Pl. Dep. 168-172, Ex. 40). Plaintiff has no idea whether it was ever shown to anyone at GPS and has adduced no evidence that anyone at GPS ever became aware of it - in fact, neither Ms. Keithley, Ms. Nadeau

nor Ms. Bolella had any knowledge of its existence. (Keithley Dep. 162; Nadeau Dep. 230-231; Bolella Dep. 165). Complaint (1) therefore does not and cannot form the basis of the 31-51m claim.

As to Complaint (2), as Plaintiff herself concedes in her statement to the with the OSHA Division of the Connecticut Department of Labor (contained in Complaint (3), Pl. Dep. 166, Ex. 41, p. 3 DEF000495) and as the evidence reflects (*see, e.g.,* letter from OSHA to KHS dated February 9, 2012, Pl. Dep. 270, Ex. C), GPS was not aware of it until at least February 9, 2012, the day after Plaintiff stormed out of KHS, refusing to speak with her supervisor or Ms. Keithley about her PIP. And significantly, the February 9, 2012 letter to KHS does not identify Plaintiff as the individual who lodged the complaint; in fact, the letter does not even state that it received a complaint but instead indicates that OSHA had "received a notice of health hazards . . .". (Id). Moreover, it was the KHS Administrator, Ms. Archambault – who had no involvement whatsoever in either Plaintiff's employment or the termination thereof - who received and responded to this February 9, 2012 letter to KHS; there is no evidence she shared it with anyone and again, every witness involved denied ever having seen the letter. (Pl. Dep. 270, Ex. C; Keithley Dep. 175-178; Bolella Dep. 172-173; Nadeau Dep. 231).

Similarly, as to Complaint (3), it was not processed by the public agency until February 15, 2012; none of the witnesses had ever seen it; and Plaintiff has adduced no evidence as to when, if ever, it was brought to the attention of KHS or GPS. (Pl. Dep. 166, Ex. 41; Keithley Dep. 170-172; Nadeau Dep. 231, 237-238; Bolella Dep. 165). Dispositively, however, it is clear this complaint was processed on February 15, 2012 and therefore even if sent to GPS it would have had to be after that date – the date on which Plaintiff's termination letter was mailed.

In short, the undisputable evidence is that no one at GPS was aware Plaintiff had made a complaint to a public agency on or before the date of the decision to terminate her employment. As a result, her claimed violation of C.G.S. Sec. 31-51m warrants summary dismissal on its face. *See* Rigano, supra, 2005 Conn. Super. LEXIS 1705 at *13 (granting an employer's summary judgment as to plaintiff's Section 31-51m claim because all decision-makers denied any knowledge of any complaints at the time of plaintiff's termination and the plaintiff failed to present any admissible evidence on the issue of whether the defendant was aware of plaintiff's complaint at the time of termination).

    2.    <u>Plaintiff Fails To Present Any Evidence That Genesis' Legitimate Non-Discriminatory Business Reason For Plaintiff's Termination Was Pretext</u>

Even if Plaintiff could establish some *prima face* evidence of causation, GPS has proffered a legitimate, non-retaliatory reason for her termination – as noted, her performance, her bizarre interactions with her supervisor, and her confession about throwing her dog down stairs – all within just 66 days of employment.

For the foregoing reasons, Plaintiff's Section 31-51m claim fails and GPS is entitled to summary judgment as to Count Four.

VI.   CONCLUSION

For the above reasons, Defendant Genesis Eldercare Physician Services, Inc. d/b/a Genesis Physician Services respectfully requests that this Court enter summary judgment on all three Counts of Plaintiff Gayle Gwozdz's operative Second Amended Complaint.

Respectfully submitted,

DEFENDANT,
GENESIS ELDERCARE PHYSICIAN
SERVICES, INC. D/B/A GENESIS
PHYSICIAN SERVICES


By:   */s/ Holly L. Cini*
      Holly L. Cini (ct 16388)
      cinih@jacksonlewis.com
      Sarah R. Skubas (ct 28327)
      sarah.skubas@jacksonlewis.com
      Jackson Lewis P.C.
      90 State House Square, 8th Floor
      Hartford, CT  06103
      T: (860) 522-0404
      F: (860) 247-1330

## CERTIFICATION OF SERVICE

I hereby certify that on July 30, 2014, a copy of the foregoing was filed electronically and served by mail on anyone unable to accept electronic filing. Notice of this filing will be sent by e-mail to all parties by operation of the Court's electronic filing system and by mail to anyone unable to accept electronic filing as indicated on the Notice of Electronic Filing. Parties may access this filing through the Court's CM/ECF System.

/s/Sarah R. Skubas
Sarah R. Skubas